(118 App. Div. 10)

RIDGELY v. TAYLOR et al.

(Supreme Court, Appellate Division, Second Department. March 15, 1907.)

BROKERS—POOL AGREEMENTS—BREACH.

    Where plaintiff, who was well versed in Wall Street methods, and the operation of pools to purchase stock, etc., entered into a pool, providing for the purchase of not more than 400,000, nor less than 200,000, shares

of stock, for the appointment of a manager with authority to buy and sell at his discretion, and for a continuance of the pool for more than one year, and plaintiff testified that it was necessary to the successful termination of a pool that its members should not be permitted to sell individually, plaintiff's evidence that he made a collateral agreement with defendants (his brokers), by which they agreed that plaintiff might sell his pool stock whenever he saw fit which agreement defendants denied, was insufficient to enable plaintiff to recover for defendants' refusal to sell plaintiff's stock in violation of the pool contract.

Appeal from Trial Term, Kings County.

Action by A. N. Ridgely against Talbot J. Taylor and others. From a judgment for plaintiff, and from an order denying defendants' motion for a new trial, they appeal. Reversed. New trial granted.

Argued before HIRSCHBERG, P. J., and JENKS, HOOKER, MILLER, and GAYNOR, JJ.

Augustus Van Wyck, for appellants.

O. N. Brown, for respondent.

MILLER, J. This case has been tried twice, each trial resulting in a verdict for the plaintiff. On the first trial the court set aside the verdict, and dismissed the complaint. This we held was error (107 App. Div. 265, 94 N. Y. Supp. 1089), but as we were not satisfied with the verdict we did not reinstate it, but granted a new trial. The defendants now appeal from a judgment entered on a second verdict, and from an order denying a motion for a new trial.

The nature of the action was stated by us in rendering the judgment on the first appeal; we then said:

"The plaintiff's evidence established, if true, a distinct independent agreement to purchase, carry and sell upon order 1,000 shares of stock, of which the signing of the pool agreement was a mere incident."

We also called attention to the fact that the testimony of one of the defendants tended to substantiate the claim that the pool agreement was collateral to the agreement for breach of which the action was brought. The evidence upon this point in the record now before us is not quite so clear as upon the former trial, but the plaintiff does testify that the defendants agreed to purchase for him 1,000 shares of pool stock at not more than 60, to carry the same upon a margin of 5 per cent., and to sell upon order; that subsequently they notified him that the stock had been bought, and that thereafter, at their request, he authorized them to sign the pool agreement, but that it was never submitted to him, and he was ignorant of its contents. The case was tried and submitted to the jury by the learned trial justice in exact accord with our former opinion, but it is now urged that the finding of the jury that the contract was made, as claimed by the plaintiff, is against the weight and preponderance of the evidence.

The pool agreement and the plaintiff's letter authorizing the defendants to sign it on his behalf are in evidence. That agreement provides for the purchase of not more than 400,000, nor less than 200,000, shares of stock, for the appointment of a manager with authority to buy and sell at his discretion, and for a continuance of the pool until April 1, 1903. On the first trial, the plaintiff testified that he had known of pool agreements which permitted the members of the

pool to sell independently of the pool.  On the trial now being reviewed, he said he had known of one such pool which he termed a "floating pool," whose members contributed from $1 up, and were permitted to come in at a stated price, and go out when they wished; but he admitted that no such arrangement would be practicable in the case of a pool of from 200,000 to 400,000 shares, and that to make such a pool a success its members would have to adhere, and could not be permitted to sell individually.  He also admitted that it would require some time to buy as much as 200,000 shares of stock to advantage, and that of necessity the purchase would be at varying prices, and it appears that the 200,000 shares of stock necessary to be purchased before the pool by its terms was to become operative were not purchased until some time after January, 1902, the date of the pool agreement.  Monthly statements of the plaintiff's account were rendered him by the defendants containing the following item: "Participation. So. Pac. Syn. 1000 Shrs."  It appeared from the plaintiff's testimony that his sole business was that of financial writer and stock speculator.  Many of the forecasts furnished by him to customers as a guide to Wall Street speculation are in evidence, and they show that, according to his own claim, he was no novice in Wall Street methods, but was well versed in the operations of pools, syndicates, etc.  His testimony contained in this record respecting the requisites of a successful pool agreement is so inconsistent with the agreement which he claims was made, and all the record evidence is likewise so inconsistent therewith, that we think justice requires a new trial.

The judgment and order should be reversed, and a new trial granted; costs to abide the event.  All concur.

GAYNOR, J. (concurring).  I concur, but desire to put my vote on the further ground that the plaintiff knew, and would have to be deemed as matter of law to know, what a pool to buy and sell stocks is; and that therefore for him to have an agreement with the brokers representing the pool, the agents of the pool, unknown to his associates in the pool, that he could have such brokers sell out for him the shares of stock representing his interest in the pool whenever he saw fit, would be inconsistent with the purposes of the pool, and a breach of trust or a fraud in respect of his said pool associates.  The pool meant that they were to stand together—buy together and sell together and share the profit or the loss—and no secret agreement in conflict with that status and purpose could be valid.  The plaintiff could not be both in the pool and out of it.  By secretly selling when he saw fit he could injure the pool—all of his associates.  He could reap a profit, not share it with them, and in the end not share the loss, if there should be one.  His claim is that he had such an agreement with the brokers, but the law did not suffer him to have such an agreement, and it therefore goes for naught if it exists.