plaintiffs have to elect which they will sue on; they cannot sue on both. Edison Company v. Kalbfleisch Co., 117 App. Div. 842, 102 N. Y. Supp. 1039.

The judgment should be reversed and the demurrer sustained, with leave to plead over on payment of costs. All concur.

---

### VAN NOSTRAND v. VAN NOSTRAND et al.

(Supreme Court, Appellate Division, Second Department. May 12, 1908.)

On rehearing. Resettlement of order directed.

For former opinion, see 110 N. Y. Supp. 142.

Argued before WOODWARD, JENKS, GAYNOR, RICH, and MILLER, JJ.

Henry Hirschberg, for the motion.
Sullivan & Cromwell, opposed.

PER CURIAM. It is improper to enter a judgment on the dismissal of an appeal from an order. The written direction or determination of June 8, 1889, amending the judgment, has been treated on the different appeals to this court as an order. If, however, it be a judgment (see Saal v. South Brooklyn Railway Co., 122 App. Div. 364, 106 N. Y. Supp. 996; Wetmore v. Wetmore, 162 N. Y. 503, 56 N. E. 997, 48 L. R. A. 666; Livingston v. Livingston, 173 N. Y. 377, 66 N. E. 123, 61 L. R. A. 800, 93 Am. St. Rep. 600; Chester v. Buffalo Car Mfg. Co., 183 N. Y. 425, 76 N. E. 480), it was proper to enter a judgment of dismissal on our decision dismissing the appeal. Stevens v. Central Nat. Bank, 162 N. Y. 253, 56 N. E. 628; Id., 168 N. Y. 560, 61 N. E. 904. We reversed the order denying the motion to vacate the judgment of dismissal entered by the clerk, for the reason that the clerk had no authority to enter a judgment not directed by us, and our dismissal of an appeal from what was in terms an order did not amount to such a direction. On re-examining the case we conclude to direct a resettlement of our order of July 23, 1907, so as to direct the entry of a judgment dismissing the appeal.

Motion denied, but order of July 23, 1907, resettled in accordance with opinion.

---

### RIDGELY v. TAYLOR et al.

(Supreme Court, Appellate Division, Second Department. May 1, 1908.)

1. APPEAL—LAW OF CASE.

A decision on appeal that there was a question of fact for the jury to determine becomes the law of the case.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 4358–4368.]

2. WORDS AND PHRASES—"INVIOLATE."

To be "inviolate" is to be unhurt, uninjured, unpolluted, or unbroken.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 4, p. 3759.]

3. New Trial—Grounds—Sufficiency of Evidence.

Under Const. art. 1, § 2, providing that the right to trial by jury shall remain inviolate, there is no justification where there is evidence to support a proposition in continually setting aside the verdicts of juries until one happens to be found to agree with the trial court.

4. Same.

Where three juries, none of which are shown to have been governed by any improper motives, except as may be gathered from the verdicts rendered, have believed plaintiff's version of a transaction which is not highly improbable when all the circumstances are taken into view to permit the third successive verdict to be set aside because the court may think a different result should have been reached, is to nullify, in its spirit, Const. art. 1, § 2, providing that trial by jury shall remain inviolate.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, New Trial, §§ 162–165.]

Gaynor, J., dissenting.

Appeal from Trial Term, Kings County.

Action by A. N. Ridgely against Talbot J. Taylor and others, doing business under the name of Talbot J. Taylor & Co. Verdict for plaintiff, and, from an order setting the same aside and granting a new trial, plaintiff appeals. Order reversed, and verdict reinstated.

See 103 N. Y. Supp. 262, 118 App. Div. 10.

Argued before WOODWARD, JENKS, GAYNOR, RICH, and MILLER, JJ.

I. R. Oeland (Owen N. Brown, on the brief), for appellant.
Augustus Van Wyck, for respondents.

WOODWARD, J. This is the third time that this case has been before this court upon appeal. Upon the first trial the defendants moved for the direction of a verdict. The court reserved decision upon this motion, took the verdict of the jury, which found in favor of the plaintiff for $10,000, and then set aside the verdict, and directed a verdict for the defendants, on which a judgment was entered dismissing the complaint upon the merits. Upon appeal to this court the judgment was reversed and a new trial granted, it being said that the "plaintiff's evidence established, if true, a distinct independent agreement to purchase, carry, and sell upon order 1,000 shares of stock, of which the signing of the pool agreement was a mere incident." 107 App. Div. 265, 94 N. Y. Supp. 1089. In other words, this court held that there was a question of fact for the jury to determine, and this became the law of this case. Upon the second trial the jury found a verdict in favor of the plaintiff for the sum of $23,000, the amount claimed, and, upon appeal to this court, the judgment was reversed on the ground that the verdict was against the weight of evidence, but with no suggestion that the previous decision, holding that there was a question of fact for the jury to determine, was not still the law of the case. A new trial was granted, and upon this third trial the jury has again found in favor of the plaintiff for the full amount of his claim, the evidence being substantially the same as that heard upon the previous trials, and the learned justice presiding has set the verdict aside upon motion as being against the weight of evidence, relying largely upon the opinion of the court upon the last appeal, though apparently with some misgivings as to the propriety of the ruling.

Section 2 of article 1 of the state Constitution provides that the "trial by jury in all cases in which it has been heretofore used shall remain inviolate forever," language which could hardly be made stronger, and yet, if verdicts founded on sufficient evidence may be continually set aside because the trial justice, or those who pass in review upon the record, happen to differ with the jury as to the weight of evidence, the guaranty is hardly worth preserving in civil actions. The great privilege which those who emigrated to this country from England brought with them "as their birthright and inheritance, as a part of that admirable common law which had fenced around and interposed barriers on every side against the approaches of arbitrary power" (Thompson v. Utah, 170 U. S. 343, 350, 18 Sup. Ct. 620, 622, 42 L. Ed. 1061), is a barren ideality, subject to be overturned at will. To be "inviolate" is to be unhurt, uninjured, unpolluted, unbroken. 17 Am. & Eng. Ency. of Law, 478. If the provision of the Constitution is to remain "inviolate forever," it must not be violated either in form or spirit. There can be no justification where there is evidence to support a proposition to continually set aside the verdicts of juries until a jury happens to be found to agree with the trial court. There is a place somewhere where the spirit of the constitutional guaranty requires that the verdict of the jury shall be final; and where there has been a sufficient number of trials, under fair conditions, so that it cannot be presumed that the jury has been under the control of passion, corruption, or other improper motives, or has failed to give to the evidence proper consideration, it is the duty of the court to give effect to the verdict and to end the litigation. This court upon two previous appeals has, in effect, held that there was evidence in the case which was sufficient to submit to the jury; that there were two versions of the controversy, one of which was supported by the evidence offered by the plaintiff, and which, if believed, entitled the plaintiff to recover. Three juries, none of which are shown to have been governed by any improper motives, except as this may be gathered from the verdicts rendered, have believed the plaintiff's version, which is not so highly improbable when all of the circumstances are taken into view, and to permit this verdict to be set aside because we, looking at the record, may think a different result should have been reached, is to nullify the Constitution in its spirit, and to needlessly prolong a litigation. The plaintiff was a writer upon financial matters. He issued letters advising clients upon the conditions existing in Wall street, and the defendants were interested for themselves and their clients in promoting the success of the Southern Pacific pool. If they saw fit, for the purpose of inducing a friendly attitude on the part of the plaintiff, to make a contract with him for the purchase of 1,000 shares of the pool stock, and to agree that he might sell his holdings whenever he desired, the fact that this might interfere with the pool is not material. The defendants might have had such an interest that they were willing to make this concession, and it does not necessarily follow that it would have changed the relations of the other members of the pool, for, as far as the evidence goes, the defendants might have purchased the interest of the plaintiff at the market price when he directed the sale, and have continued the stock in the pool. The plaintiff did not demand that the stock be sold

outside of the pool. What he asked for was to have his stock sold so that he could realize his profit. He had a right to make this contract with the defendants. They had a right to make the contract with him, and the evidence has convinced three juries that this was the contract which he actually made, and the mere fact that the case rests largely upon the testimony of the plaintiff is not a ground for holding that the defendants are entitled to a continuous trial of this action. This court in the case of Lacs v. Everard's Breweries, 107 App. Div. 250, 95 N. Y. Supp. 25, upon a full review of all the authorities, held that, where a plaintiff had had three successive verdicts upon substantially the same evidence, the trial court was not justified in setting aside a verdict as against the weight of evidence, and no good reason occurs to us why that case should not be followed in the disposition of this.

In Callanan v. Shaw, 24 Iowa, 441, 444, Beck, J., in disapproving an instruction "that no important case can be proved without at least the testimony of one credible and unimpeached witness," makes these pertinent remarks:

"It is impossible from the nature of things for the law to provide rules which shall determine the quantity or amount of evidence necessary to establish a fact in judicial proceedings. There can be devised no standard, no unit of measurement, whereby we may determine just what measure of evidence shall be required to prove a fact in issue. To say that one credible witness is necessary is a very unsatisfactory and indefinite rule indeed. As a matter of fact, evidence can usually be brought before a jury only through the medium of human testimony. There must of necessity be a witness, or one standing in that position, through whom the fact can be brought to the mind of the court or jury. There must be, then, in most cases, to establish a fact, a witness, whether the fact be important or unimportant. But this rule gives no measure for the quantity of evidence; for knowledge, intelligence, qualities of memory, and all other attributes that make up ability, together with those moral qualities which constitute credibility, are most unequally united in men, so that one possessing all of the attributes of ability and credibility in the highest degree, and so known to the tribunal before whom he testifies, would, in his evidence, outweigh an indefinite number of witnesses who possess the same attributes in the lowest degree. It is also true that a witness, in order to prove a fact by his evidence, must be credible. He must be such a witness as will be entitled to receive the belief, the faith of others. But here again, from the very nature of the case, there are indefinite degrees in this character we call credibility. One may possess it in the highest degree, another in the lowest. It follows, therefore, that when evidence is weighed, to determine whether a fact has been proved thereby, all the qualities going to make up what is termed ability and credibility to a witness must be fully considered in order to arrive at a truth. And who shall so weigh and consider these qualities? Most evidently the jury. The court cannot discharge this duty for them, because the very opinion which they may form from these questions of ability and credibility in truth determine their finding. * * * If the evidence from want of intelligence, or from any other cause, is incompetent under the rules of law, the court will not permit him to testify; but, when the evidence of the witness is before the jury, all questions of credibility are for them, and for them alone."

We have not seen the witnesses. We know nothing of their appearance upon the stand, and the thousand and one little matters that enter into the problem of credibility, and 36 men, fixed upon by the Constitution as the triers of fact, having held with the plaintiff, and even the trial justice not appearing to have acted upon any conviction of his own that the trial was not fair and impartial, it would seem to be time that we recognized the right of the jury to assume the re-

sponsibilities of this controversy, and to end the litigation by restoring the verdict.

The order appealed from should be reversed, and the verdict of the jury reinstated.

MILLER, J. (concurring).  The record now before us presents the same questions of law that were involved in both of the former appeals, on each of which we said:

"The plaintiff's evidence established, if true, a distinct, independent agreement to purchase, carry, and sell upon order 1,000 shares of stock, of which the signing of the pool agreement was a mere incident."

I agree with Mr. Justice WOODWARD that there comes a time in the history of every lawsuit when the decision of a jury, on a question which must ultimately be decided by them, should be final.  Independently of the main question, I can discover nothing in this record of which the defendants can justly complain.  The correspondence between the parties was clearly admissible.  The question for the jury was sharply defined and the circumstances favorable to the defendants were emphasized by the charge of the court.  Having twice held, on substantially the same record, that there was a case for the jury, I think that respect for the orderly administration of justice requires us to adhere to that ruling, to the end that this litigation may finally be terminated by a controlling decision of the court of last resort.  If the plaintiff proved a contract, independent of the pool agreement, all discussion of the nature of pools and the rights of pool members is beside the question.  The fact in issue was whether such a contract was made.  All else was collateral and relevant only as bearing on the probability of its having been made.  After a critical re-examination of the case, I am satisfied that the importance of the collateral matter has heretofore been much magnified, and thus the real issue has been obscured.  It must be conceded that, if the plaintiff's evidence merely proves that he went into a speculative pool, as is said, he cannot recover in this action.  On the other hand, if his evidence tends to establish a valid contract independent of the pool substantially as alleged, he may recover.  And it is important that the precise facts, the relations between the parties, the chronology of events, and the conversations between them be understood.

The defendants were the plaintiff's brokers.  They were members or prospective members of a pool organized, or in process of organization to speculate in Southern Pacific stock.  They were not the agents of the pool; the sole agent and manager being Mr. Keene.  The pool agreement provided that signers of the agreement holding 60 per cent. in amount of the certificates subscribed could call for a settlement and a dissolution of the pool upon giving 30 days' notice, and the manaager was required to report the pool dealings to the members of the pool every 30 days.  The defendant James B. Taylor testified:

"We had taken an interest for the firm in this pool, and we would take an interest for some of our customers, letting them participate under us in the pool, as Mr. Keene did not take any one on his paper except stock exchange houses."

He admitted that the plaintiff would not have been allowed to sign the pool agreement. The organizer and manager of the pool would not allow any one but a stock exchange house to become a member for the obvious reason that he did not want the possible interference of outsiders or a too general distribution of the accounts of the pool transactions. I quite agree that the plaintiff could not be both in and out of the pool. He says he was never in the pool. The defendants say in effect that he was not in it until it was dissolved. I think upon their own showing they were members of the pool, but the plaintiff never became one. Of course, no one but the manager could buy or sell on behalf of the pool, but the pool members could engage in as many independent transactions as they liked in that particular stock. The pool agreement contemplated that the certificates would be distributed among the members from time to time as purchases were made, and according to the testimony of one of the defendants that was done. The agreement provided that "the same amount of certificates" should be returned to the manager when called for. It also contained the following provision:

"We further agree to deliver to said agent and manager the same certificates delivered to us by him, as he may call and pay for them at cost and interest, at a rate not to exceed five per cent. (5 per cent.) per annum, excepting in case of transfer, in which event the number of the certificates thus transferred are to be furnished the said agent and manager and the new certificates are to be delivered to him in lieu of the original certificates delivered to us by him when called for."

That agreement clearly contemplated that transfers of certificates held by the members might be made. They were obligated merely to return when called upon a like amount. I do not suppose any one imagines that every transaction on the stock exchange is represented by an actual transfer of certificates, or that any attempt is made in a stockbroker's office to hold against each transaction the identical certificates purchased. The defendants could deal ad libitum in the Southern Pacific stock, and their membership in the pool only obligated them to be prepared to deliver on demand to the manager the same amount of stock which they had received from him; and, whatever their relations to the pool were, I can perceive no legal obstacle to their purchasing stock for the plaintiff, or to their selling him an interest in their pool holdings, represented by a stated number of shares, on any terms which they and he could agree upon. We come now to the actual agreement made.

The plaintiff testified that one of the defendants informed him of the organization of the Southern Pacific pool, and advised him to buy some of the stock, so as to get in at the bottom, as it was going to advance. I quote:

"I asked him for further details, all the conditions under which I would have to buy stock, and for what price I could get it at. Well, he said that they, or at least Keene, had already bought 150,000 shares of it, and they would either buy 1,000 for me in open market or probably would give me 1,000 shares of what Keene had bought, and in that case it would be given to me at two or three points less than the market price, but, if they bought it at the market price, I would get it at the price then prevailing, which was 59 or a little less; and I gave the order to buy it. * * * I asked him how I would

stand if I wanted to sell this stock, and he said I would stand to be the same as if I bought the stock in the open market; that, if I became dissatisfied with the way the pool was being conducted, or if for any other reason I desired to get out of this thousand shares, I would have the right to sell a thousand shares, or any part of the thousand, at any time I saw fit."

The foregoing evidences something more than an indefinite statement as to the salability of the stock. It is to be interpreted according to the relations of the parties and the nature of the transaction. The defendants were to buy as agents for the plaintiff, and carry on margin. They were to hold the stock as pledgees. If it were to be sold, they would have to sell it on his order; and, if that conversation occurred, it could only have been understood by the parties in one way; i. e., that the defendants obligated themselves to treat the transaction as between the immediate parties precisely like a purchase in the open market. It is immaterial that this may have required them to take his stock or his interest in their stock off his hands. Continuing, the plaintiff testified:

"The date of that conversation was on or about the 25th of January, 1902. I did not see the pool agreement. On the 25th of January I don't recall that there was anything said about a pool agreement. They said they would carry these ten [evidently meaning one] thousand shares for me on a small margin of 5 per cent., or, at the most, 10 per cent. * * * The next time I had any conversation about this was two or three days later, in the customers' room. I asked Mr. Taylor if he had bought this thousand shares as I had ordered. He said he had. To make my mind easy about it I asked him what price it had been bought at. He said I need not worry about that that he didn't recollect the exact fraction, but I had it on the terms agreed on and lower than the price at which it was selling then. It had gone up a couple of points then, and it would not go back again that low."

According to the plaintiff's version, the contract had now been made and executed so far as the purchase was concerned. Thus far there is no suggestion that the plaintiff was to become a member of the pool. The defendants were to purchase, and they informed him that they had purchased, for his account 1,000 shares of stock. They had the option of purchasing in the open market, or of allotting him a corresponding interest in their pool holdings; and whether they purchased in the open market or through the pool was immaterial to him. He was concerned only with the result, which as between the parties was to be that of a purchase of stock to be carried on margin by the broker and sold on order. The plaintiff testified that subsequently said defendant asked him to sign a note ratifying the verbal agreement, saying that it was only a matter of form. That note is as follows:

"Feb. 1st, 1902.

"Messrs. Talbot J. Taylor & Co., New York—Dear Sirs: Confirming my talk with your firm, I hereby authorize you to sign the Southern Pacific agreement, to Mr. James R. Keene as agent and manager, for 1,000 shares for my account.

"Yours truly,                              [Signed]     A. N. Ridgely.
"A. N. Ridgely, Esq."

That writing standing alone would establish the fact that the plaintiff became a member of the pool through the defendants as agents, but, when considered in the light of the plaintiff's testi-

mony, the time and circumstances under which it was given, and the conceded fact that the plaintiff would not have been permitted to become a member of the pool, it does not have that effect. I am considering now its legal effect, not its value as an evidentiary fact. Continuing, the plaintiff testified in reference to a subsequent conversation, in which he requested permission to see the pool agreement, as follows:

"Finally they said it was only a private paper between themselves and Mr. Keene anyway; that it didn't concern me; that I could look at it if it was any satisfaction to me, but it had nothing to do with me; that as far as I was concerned the pool agreement was only a matter of form; that it was between them and Mr. Keene."

The plaintiff's understanding of the transaction is thus stated by him:

"I did not express my desire to go on and take an interest in the pool for the thousand shares. I was to take a thousand shares of his participation— that they were going to participate in it, and gave me a thousand shares of their stock."

I think the contract proved does not differ in substance or effect from that alleged, and that should be the test. The members of the pool had to take their stock at the average price, which could only be determined on the dissolution of the pool. The defendants agreed to purchase for the plaintiff a thousand shares of stock in the open market, or to allot him a corresponding interest in their holdings at the market price. The members of the pool had to respond to the calls of the manager as purchases were made. The defendants agreed to carry the plaintiff's stock or interest on a margin of 5 or not to exceed 10 points. The net result of the pool speculation could not be determined until a final accounting. The defendants agreed to sell the plaintiff's stock or close out his interest on order on the basis of stock exchange sales. If the plaintiff's version is to be believed, the transaction was in effect the ordinary stock transaction between broker and customer, and whether it should be that in form rested with the defendants who controlled the transaction and had the choice of method. Upon that theory the pool agreement was a collateral matter, and the plaintiff's knowledge of stock speculation and of pool methods is of less importance than it has heretofore been considered by us.

It was immaterial to the plaintiff how the defendants discharged their obligation to him. One of the defendants testified that, when the plaintiff's margin was exhausted, they assumed his interest at 59, and sold a thousand shares short, as the expression is, in the open market to protect themselves. It is not suggested that that was a breach of any duty which they owed to the pool members, nor is there any apparent reason why they could not have done the same thing when he ordered them to sell. I agree with Mr. Justice WOODWARD that the verdict should be reinstated, with costs. All concur, except GAYNOR, J., who dissents.

GAYNOR, J. (dissenting). This case has been here twice before (107 App. Div. 265, 94 N. Y. Supp. 1089; 118 App. Div. 10, 103 N. Y. Supp. 262), but it must now be decided on the present record, and on questions which have not heretofore been disposed of. It should have been dismissed on the last trial. It needs to be reduced to precision.

The plaintiff is a Wall street man and an expert in stock speculation. He not only speculates in stocks himself, but induces others to do so under his tutelage and advice. Among much else of the same kind he has written a book called "The Study and Science of Stock Speculation," which has already passed through its 16th edition. In it he writes of stock speculation by pools, and recurs to the subject under the heading, "A Further Study of Pool Methods." Knowing all about stock pools himself, he teaches others what they are and encourages or allures them into that method of speculation.

The complaint is that on or about January 27th, 1902, the plaintiff employed the defendants as stockbrokers to purchase 1,000 shares of Southern Pacific stock for him on margin at not to exceed $60 a share, and hold and carry the same for him subject to his order for its sale or other disposition; that the plaintiff agreed to put up money as margin to secure the defendants from loss on account of such purchase and carrying; that the defendants did purchase the said stock for the plaintiff at $60 a share, and carry the same for him, and that he put up with them $10,000 as margin; that on or about October 17th, 1902, the market price of his said stock being $73 a share, the plaintiff directed the defendants to sell the same for him, which they failed and refused to do; wherefore the plaintiff prays judgment for $23,000, i. e., $13,000 profit on the stock by the rise in its price from 60 to 73, and the $10,000 held by the defendants as margin.

This is an ordinary and simple cause of action permitting only proof of the said contract, the purchase and carrying of the stock under it, the refusal to sell and the damages caused thereby. But not only was no such cause of action proved, but no attempt was made to prove it. It had to be abandoned from the outset, for there was no such transaction between the parties. Instead of an agreement to purchase and carry 1,000 shares of stock for the plaintiff and sell them out and deliver them in the market on his order at any time he chose, the plaintiff proved that through the defendants as his brokers he went into a speculative pool, composed of many people, for the purchase and sale of the said Southern Pacific stock to the extent of not less than 200,000 nor more than 400,000 shares, the profit or loss at the end and liquidation of the joint venture to be shared among the members of the pool; that the share or participation he took in such pool and pool stock was 1,000 shares on the basis of $60 a share; and he was permitted to recover a verdict of $23,000 against the defendants on the ground that he ordered them to sell and deliver the said 1,000 shares of stock for him on the market, i. e., on the exchange, on October 17th, when it was $73 a share, and they refused, informing him that they could not do so, for the reason that it belonged not to the plaintiff but to the pool. They could not sell it if they wanted to, for all of the stock of the pool was purchased, controlled and sold by the agent and

manager of the pool only, and could be purchased or sold by no one else. The plaintiff's brokers could no more sell the stock of the pool than he could himself.

To come from a general statement to the precise facts (for it seems necessary to state them), the plaintiff, instead of proving the cause of action alleged in the complaint, was allowed, against the repeated objection and exception of the defendants' counsel, to present the following case:

He testifies that one of the defendants informed him that a pool to buy Southern Pacific stock was being formed, and asked him to go into it, and he consented to take an interest of 1,000 shares in the pool on the basis of not to exceed $60 a share, which was then about the market price. This, he says, was about January 25th, 1902. On February 1st he signed and delivered to the defendants a letter authorizing them to subscribe the pool agreement for him as follows:

"Confirming my talk with your firm, I hereby authorize you to sign the Southern Pacific agreement, to Mr. James R. Keene as agent and manager, for 1,000 shares for my account."

They thereupon put him in the pool for that many shares, as the regular monthly statement rendered by them to him at the end of February showed by an item of date February 6th of his said pool interest or participation, viz., "Southern Pacific syndicate for 1,000 shares." Each monthly statement thereafter contained this same item in the words, "Participation S. Pac. Syn. 1,000 shrs," until it was closed out on December 6th, 1902. The account included many other items, for the plaintiff was at the same time speculating in many stocks on margin through the defendants. The plaintiff's counsel put the pool agreement in evidence. It showed that the defendants subscribed it for three blocks of stock, one for 30,000 shares and two for 10,000 each, i. e., for 50,000 shares in all. Only brokers signed the agreement; all others came into the pool through them and were represented by them. The plaintiff came in by authorizing the defendants in writing to subscribe the pool agreement for him, as has already been seen. He says that at the time of signing such authorization, and after doing so, "Then I asked what the pool agreement was, and said I would like to see a copy of it. He (one of the defendants) said it was not ready at that time, and it was only a matter of form anyway, but if I wanted to see it they would show it to me in the course of a few days." Up to that time he says nothing had been said of the pool agreement. He says that he afterwards asked the defendants to show it to him, but they did not, and that he never saw it until after this action was brought. But this is no matter; except as it is confirmatory that there is no dispute that the plaintiff knew there was a written pool agreement, of which Keene was the agent and manager, and subscribed to it through the defendants. This is not an action for deceit for statements or concealments in respect of the pool or pool agreement, if there could be any pretense of deceit. The plaintiff did not ask to see the pool agreement before subscribing to it, or inquire as to its nature or contents; he knew perfectly well what a pool agreement was; that it bound all who went into the pool to

stand or fall together in the joint venture, and share the final profit or loss; that no one could be in it and out of it at the same time. Such agreement was in substance that the subscribers were to purchase not less than 200,000 nor more than 400,000 shares of Southern Pacific stock, and it appointed James R. Keene sole agent and manager of the pool to make such purchases from time to time at his discretion, and to sell at his discretion at any time the whole or any part of the stock so purchased, the joint speculation or venture to be closed up by April 1st, 1903, or sooner on the request of persons interested in it and representing 60 per cent. of the stock subscribed for; and the profits to be divided pro rata according to the interest of each one in the pool. It was also agreed therein that those in the pool should, upon demand of such agent and manager, as purchases were made from time to time by him, pay to him their pro rata share of the money paid therefor. The plaintiff says that in the middle of October he told the defendants that he "wanted to sell the thousand shares of stock" (i. e., the 1,000 pool shares representing his pool interest or participation) on the market, and that they told him he had no right to do so, that he was bound by the pool agreement. On October 24th the plaintiff wrote to the defendants as follows:

"I notified you about one week since to close out my pool holdings of Sou. Pac., and that if you persisted in holding the stock you are doing so on your own responsibility and risk. I do not wish to press for a cash settlement while the pool is in its present muddled condition, but I shall expect an accounting in due course on the basis of 1,000 shares bought at or below 60 and sold between 73 and 74."

Although the plaintiff was therefore undisputedly in the joint venture or pool, and by this letter acknowledges that an accounting must be had to ascertain the amount that would be coming to him out of the pool, he is allowed to recover in this action, not on the basis of a pool accounting and division, but for the difference between the market price of Southern Pacific stock when he went into the pool, viz., 60, and its market price when he asked the defendants to sell on the market for him his "pool holdings," viz., 73. It remains to state precisely on what basis, or semblance of basis, this came about.

At the said conversation of the plaintiff and one of the defendants on January 25th, when the plaintiff concluded to go into the pool for 1,000 shares, he testifies that the following occurred:

"The question of selling it was discussed if the management of the pool should appear unsatisfactory to me—I asked him how I would stand if I wanted to sell this stock, and he said I would stand to be the same as if I bought the stock in the open market, that if I became dissatisfied with the way the pool was being conducted, or if for any other reason I desired to get out of this 1,000 shares, I would have the right to sell a thousand shares, or any part of the thousand, at any time I saw fit."

This testimony does not make out the contract and cause of action alleged in the complaint. It only evidences what is evidenced at every step in the case, and stands conceded, viz., that the plaintiff was in a pool to buy and sell stock on speculation, instead of the individual purchaser and owner of 1,000 shares, and that such pool was of course under control and management.

Other than this it only evidences a loose and indefinite statement by the defendants concerning the sale or salability of the plaintiff's interest or shares in the pool. But if an agreement of some kind can be spelled out of it, such agreement is plainly not that alleged in the complaint.

1. The plaintiff and his brokers concededly knew that all shares of stock purchased would be that of the pool or partnership, and held and controlled by it; that the individual members of the pool could not sell and deliver pool stock—that no one could do so except the pool, i. e., through its agent or manager. How then can this testimony be understood or construed as an agreement that the defendants should sell and deliver on the market or exchange for the plaintiff his 1,000 shares of pool stock whenever he should so order (even if the words in and of themselves were capable of such a construction)? It would be impossible for the defendants to do so, and the parties were not agreeing for a thing known to them to be an impossibility. The natural and possible meaning is that the defendants said to the plaintiff that if he got dissatisfied he could sell out his interest or participation in the pool, viz., of 1,000 shares. This he could legally do, of course, but not on the exchange as stocks are sold, and the purchaser thereof would have to step into his shoes in the pool. The stock could not be got out of the pool, or clear of it, unless by theft or fraud. If the defendants did so agree to so sell the interest or participation of the plaintiff, or take it off his hands, and broke the agreement, the contract and breach would not be that alleged in the complaint, but an entirely different one. And the measure of damages for its breach would be different. It is obvious without a word of argument that the value of such an interest or participation could not be fixed on the day of its sale and transfer by the market price of the stock on that day; the element that the stock representing such participation interest could not be sold on the exchange by the purchaser of such interest, but would have to abide the future operations and the liquidation of the pool, might make such interest unsalable, or very difficult to sell.

2. But if it were possible to take this vague evidence as making out a contract that the defendants would take the plaintiff out of the pool, and clear of the pool and all of its obligations and risks, whenever he so requested, by taking 1,000 shares of the pool stock out of the pool and clear of the pool, and selling and delivering them on the exchange (a thing impossible and known to the plaintiff to be impossible for them to do), and letting the plaintiff have the profit on them at that time, without regard to his pool associates or the future exigencies of the pool, the contract and breach would still be not that alleged in the complaint, and the measure of damages would still be different. The profit would not be the difference between the market price of the stock when the plaintiff went into the pool and such price when he went out. The pool had been meanwhile buying stock through its agent, and it may be at a higher price than that which existed when the plaintiff went in, so that the average cost would have to be struck

to ascertain what the profit on each share was on that day, or whether there was any profit—which the evidence does not disclose. There certainly cannot be an agreement spelled out of this evidence that the defendants were to pay the plaintiff more than his profit in the pool, if it be taken that they did agree to take him out of the pool and give him his profit whenever he saw fit to get out. While the plaintiff voluntarily remained in the pool he would certainly have to abide the result of the pool operations. It can not be spelled out of this evidence that there was an agreement that he could remain in in order to profit by the pool operations, and then go out in case of loss and throw the loss on the defendants.

3. Finally, if it were possible for the plaintiff to get out of the pool the 1,000 shares representing his interest, and sell and deliver them on the exchange, and keep the profit thereon, instead of sharing it with his associates in the pool as he was legally required to do, and the defendants made a contract to help him do so, or to act for him in the doing of it, such contract in addition to not being alleged in the complaint would be void. The plaintiff concededly knew in fact, and would have to be deemed as knowing as matter of law, that he was going into a joint venture with others, and that they had to act together, and could not act individually in respect of such joint venture and its interests. This is an everyday elementary proposition. Therefore for the plaintiff to make such an agreement, all unknown to and unsanctioned by his pool associates, would be inconsistent with the pool or partnership, and a fraud upon his pool associates. No court could recognize such an agreement. For the plaintiff to sell pool shares representing his pool interest free of the pool and keep the profits, instead of all profits being ratably divided among the pool members at the end of the joint venture, if, indeed, they did not meet a loss instead, would be recreant to and destructive of the joint venture. The two things could not exist together. The law is that in going into the pool the plaintiff engaged to be faithful to his associates and abide by the result of joint buying and selling. That is what a pool, partnership or joint venture necessarily is in law, and no one may gainsay it or act contrary to it. The plaintiff makes no pretense that he did not know this, if that could make a difference. No secret agreement contrary to this trust obligation of the members of the pool could be valid. It would be a breach of trust and void with whomsoever made. The law did not suffer individual members of the pool to make agreements for the sale, or to procure or cause the sale, of any of the pool stock—conceding that they could in some way get it in their hands—for their own purpose or profit.

The undisputed evidence is that all that was said and done, or arranged or agreed, between the parties, was of 1,000 shares of pool stock—stock bought by and for the pool—and not of 1,000 shares bought by or for the plaintiff, or that he owned. The complaint (1) is not on such a contract or the breach thereof, and (2)

if there be such a contract as the plaintiff has recovered on it is a breach of trust and void.

It should be added that if this piece of evidence on which the verdict rests is probative of the contract recovered on, it is then so improbable, contradicted as it is by every known fact and every honest and natural probability in the case, that the learned trial judge was right in not suffering the verdict upon it to stand.

The order should be affirmed.